
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
:
JAMES DAVIS, :     10-CV-5132 (ARR)
:
            Petitioner, :     NOT FOR ELECTRONIC
:     OR PRINT PUBLICATION
    -against- :
:     OPINION & ORDER
WILLIAM LEE, Superintendent :
Green Haven Correctional Facility, et al., :
:
            Respondents. :
:
-------------------------------------------------------------------- X

ROSS, United States District Judge:

On November 5, 2010, petitioner James Davis ("petitioner" or "Davis") filed a petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Davis challenges the

decision of the New York Supreme Court, Appellate Division, Second Department, holding that

he received effective assistance of counsel during his criminal trial. For the reasons set forth

below, Davis' habeas corpus petition is denied.

## BACKGROUND

At approximately 4:00 a.m. on January 25, 2004, during a party at a nightclub in

Brooklyn, New York, Davis shot and killed a man named Blake Harper. Feb. 17, 2011

Affirmation of Maria Park in Opposition to Petition for a Writ of Habeas Corpus ("Park Aff."),

Dkt. No. 6, ¶ 4. Following this incident, Davis was charged, by Kings County Indictment

Number 1925/2004, with two counts of Murder in the Second Degree (N.Y. Penal Law

§§ 125.25[1], [2]) and other related crimes. Id. ¶ 5. In November 2005, the case proceeded to

trial in New York Supreme Court, Kings County. On November 23, 2005, after the jury

informed the court that it was unable to reach a verdict, the court declared a mistrial. Nov. 23,

1

2005 Minutes, Park Aff., Ex. A., Part 3, 1-3. On May 3, 2006, Davis' second trial commenced. May 3, 2006 Minutes, Park Aff., Ex. A., Part 3. Joel Medows, Esq. represented Davis at his second trial. Id.

I.  Eyewitness Testimony

During Davis' second trial, the government presented testimony from three eyewitnesses to the shooting: Jose Machicote, Harold Pou, and Shawn Belton. Each eyewitness testified regarding the identity of the person who shot Harper. The relevant portions of the witnesses' identification testimony are summarized below. Because the identification testimony of each eyewitness relates to the shooter's hairstyle, at the outset, it is pertinent to note that Davis had a short, crew-cut hairstyle at the time of his arrest, during the lineup held at the 75th precinct of the New York City Police Department ("NYPD"), and at his trials. See May 8, 2006 Minutes, Park Aff., Ex. A, Part 5, 88-89; May 10, 2006 Minutes, Park Aff., Ex. A, Part 8, 217.

At trial, the state presented the eyewitness testimony of Jose Machicote, the brother-in-law of Harper, who ran into Harper at the club on the morning of the shooting. May 10, 2006 Minutes at 229. The prosecutor first questioned Machicote, who worked as a barber at the time of his testimony, regarding his criminal history. Id. at 230-232. Machicote's criminal history included convictions for robbery in the second degree, criminal possession of a weapon in the fourth degree, assault in the third degree, and drug sales. Id. Machicote spent several years in prison as a result of his convictions. Id. After testifying about his criminal history, Machicote testified about the events surrounding his brother-in-law's death. Machicote testified that he had only one drink at the club on the morning of January 25, 2004. Id. at 236. At the end of the party, there was an altercation between Harper and some other men, which arose from one person stepping on another person's feet. Id. at 237-238. Machicote stated that he attempted to

2

break up the altercation. Id. at 238. As he did so, someone started shooting. Id. at 238. Machicote looked towards the shooter, who was about thirty feet away from him. Id. at 238-239, 243. Although there were people between him and the shooter, Machicote testified that the shooter was in a lit area of the bar and that he could see the shooter's face. Id. at 239, 252. He described the shooter as having "[b]rown skin with cornrows," which are "[b]raids to the back," and facial hair on his upper lip and chin. Id. at 239, 266-267. Machicote testified that he viewed a lineup at the 75th precinct, during which he identified the person in position five as the shooter. Id. at 245. Machicote made an in-court identification of Davis as the shooter, and he stated that Davis was the same person he identified during the lineup. Id. at 240, 245. Machicote testified that Davis had changed his hair since the shooting but that he nonetheless recognized Davis as the shooter. Id. Machicote had never met Davis prior to the night of the shooting. Id. at 266.

The state also presented the testimony of Harold Pou, who attended the party with Harper on the morning of January 25, 2004. Pou testified at Davis' first trial, and the parties stipulated that his testimony from the first trial would be read into the record at the second trial. May 12, 2006 Minutes, Park Aff., Ex. A, Parts 10-11, 336. Pou testified that he did security work and was also employed by UPS. Id. at 337. He had been convicted of shoplifting a couple of times in New Jersey, but he had successfully completed his probation on those convictions. Id. at 337-338. Pou had been friends with Harper for fifteen years prior to the shooting. Id. at 338. With respect to the events surrounding the shooting, Pou testified that he had gone to the club with Harper and some other friends. Id. at 340, 342. At the club, Pou had one or two drinks. Id. at 364. Around 4:00 a.m., Pou and Harper were by the bar, along with Harper's brother-in-law, Machicote. Id. at 343. As they were getting ready to leave, Pou saw Machicote arguing with someone, and Harper walked over to them. Id. at 345. The altercation escalated as Harper, Pou,

3

Machicote and their other friends began arguing with another group of people. Id. at 345-346. As people in the two groups began to push each other, Pou heard gun shots. Id. at 346. He turned to look at the shooter, who was about six to twelve feet away, and he saw his face. Id. at 347, 357-358, 367. Pou testified that the shooter was "light-skinned" with "braids"; he could not recall whether the shooter had facial hair. Id. at 347, 373. The lighting in the area of the shooting was bright. Id. at 374. Pou stated that, during the lineup at the 75th precinct, he identified the individual in position number 5 as the shooter. Id. at 350. He noted that it took him some time to recognize the shooter because he was looking for a person with braids. Id. When asked to make an in-court identification of the shooter, Pou indicated Davis and stated: "He was the guy over there resemble him, but I know the guy had braids. Like that's the main thing that I really knew about it. He was light skinned with braids, but he resemble him." Id. at 348. Pou then testified that Davis was the person he identified at the lineup. Id. at 351.

Lastly, the state called Shawn Belton, who had been friends with Harper for ten years prior to the shooting, as an eyewitness. May 9, 2006 Minutes, Park Aff., Ex. A, Part 6, 97-98. Belton testified that, during the early morning hours of January 25, 2004, he and Harper were at a party in a club in East New York with some friends. Id. at 98-99. As the party ended at around 4:00 a.m., they moved towards the exit and spread out to talk to girls. Id. at 101-102. Belton stated that an argument broke out among some people that were not with him and his friends. Id. at 103. Harper, who was standing a couple of feet away from Belton, moved closer to the argument. Id. at 104. Then, Belton heard several gunshots fired. Id. As he tried to move towards a safe area, Belton "glanced" towards the direction of the shooter. Id. On direct examination, Belton testified as follows with respect to the identity of the shooter:

> Q: . . . . Did you see the person that was holding this thing that had sparks coming out?

4

A: No. I just glanced. I didn't have enough time to see the person.

Q: You didn't have enough time to see the person?

A: No.

Q: Sir, you understand you are under oath right now?

      MR. MEDOWS: Objection.

      THE WITNESS: Yeah, I understand.

      THE COURT: Overruled.

Q: And you are telling us now that you didn't see who it was?

A: I glanced.

Q: Well, was it a male or a female?

A: I don't know.

Q: You don't know?

A: No.

Q: Was it a clown?

A: Of course it wasn't a clown. Why would a clown be at a club.

      MR. MEDOWS: Objection

      THE COURT: Overruled.

Q: Well, do you remember speaking to detectives after this happened?

A: Yeah.

Q: Yeah?

A: Yes.

Q: You remember telling them what you saw?

A: No, I don't remember.

Q: You don't remember that?

A: No.

> MS. CHU [Prosecutor]: Your honor, permission to treat as hostile.

> THE COURT: Let's continue. Go ahead.

Id. at 104-106.

Subsequently, the prosecutor impeached Belton with prior sworn statements that he made regarding the identity of the shooter. In particular, the prosecutor questioned Belton about a tape recorded statement that he made after he viewed the lineup at the 75th precinct. Id. at 107-108. In that statement, Belton asserted that he recognized the person in position number five of the lineup "[f]rom the club as the shooter." Id. at 108. After the prosecutor read that statement to Belton at trial, Belton testified that, although he "[p]robably said it," he did not remember making the statement. Id. at 108-109. The prosecutor then proceeded to impeach Belton with his testimony from Davis' first trial in November 2005. Id. at 109. During that testimony, Belton stated that he "caught the face" of the shooter, and he described the shooter as "light-skinned" with "facial hair" and "braids." At the first trial, Belton also testified that he had identified the person in position number five of the lineup as the shooter, and he made an in-court identification of Davis as the person he identified at the lineup. Id. at 110-113. After the prosecutor read Belton's testimony from the first trial to him, Belton testified that he remembered making those statements, but that he could not presently recollect the identity of the shooter. Id. On cross-examination by defense counsel, Belton reiterated that he was "not sure who did the shooting" and could not identify anyone. Id. at 116. Upon completion of Belton's testimony, the court did not give the jury a limiting instruction regarding his testimony. See id.

6

II.    Law Enforcement Testimony

In addition to the testimony of the three eyewitnesses, the state also presented testimony

from several law enforcement witnesses, including NYPD Detective Matthew Hutchison.

Detective Hutchison was assigned to investigate the homicide of Harper. Id. at 119. He testified

that, on March 26, 2004, NYPD officers arrested Davis and brought him to the 75th precinct. Id.

at 119-120, 122. There, at about 11:45 a.m., Davis waived his Miranda rights and agreed to talk

to Detective Hutchison about the shooting. Id. at 127. According to Detective Hutchison, Davis

admitted that he had been at the club with his brother on the morning of January 25, 2004, but he

claimed that he left at 2:30 a.m. because he was not feeling well. Id. at 127-128. Davis asserted

that he then took a cab to his girlfriend's house. Id. Following this initial statement to Detective

Hutchison, Davis had further discussions with the Detective throughout the day. Id. at 129-132.

Detective Hutchison subsequently decided to put defendant in a lineup. Id. at 133. At

approximately 10:00 p.m., Pou, Belton, and Machicote each viewed the lineup independently of

one another. Id. at 142-147. Detective Hutchison did not testify as to whether Pou and

Machicote identified a shooter during the lineup. In light of Belton's recalcitrant testimony,

however, the prosecutor sought to elicit Detective Hutchison's testimony as to whom Belton

identified during the lineup. Id. at 143. Following a side-bar conference in which defense

counsel objected to such testimony, the court permitted Detective Hutchison to testify that,

during the lineup, Belton identified the individual in position number five as the shooter. Id. at

146. He further testified that Davis was the individual in position number five. Id.

III.    Summations

During his summation, defense counsel challenged the identification testimony of the

three eyewitnesses. With respect to Machicote, defense counsel argued that he was not

trustworthy because of his criminal history and because he wanted revenge for the death of his brother-in-law. May 12, 2006 Minutes at 387-388. Regarding Pou, defense counsel asserted that Pou did not identify Davis as the shooter; rather, he simply stated that Davis resembled the shooter. Id. at 387. As for Belton, defense counsel claimed that Belton could not remember what the shooter looked like. Id.

In her summation, the prosecutor relied on the identification testimony of all three eyewitnesses to argue that Davis killed Harper. In particular, she argued that the jury should credit the identification testimony of Machicote, despite his relation to Harper and his past criminal history. Id. at 395-399. With respect to Pou and Belton, the prosecutor asserted that the jury should credit their identification of Davis, regardless of any equivocation in their testimony. Id. at 393-394. Subsequently, the prosecutor argued, over defense counsel's objection, that the lineup identifications by the three eyewitnesses were entitled to significant weight. Id. at 402-403. She emphasized that, at the lineup, each eyewitness identified petitioner as the shooter despite the fact that he did not have braids in his hair. Id. at 403.

IV.    Jury Instructions

Following summations, the court instructed the jury regarding the applicable law. The court included a limiting instruction regarding the jury's consideration of a witness' prior inconsistent statements:

> THE COURT: .... Now, during the testimony, there was evidence presented which the defendant contends shows that a witness may have made. And actually the government and the defendant with respect to different witnesses, they contend that such evidence shows they may have made a prior statement inconsistent with their trial testimony. First, you have to determine whether [an] inconsistent statement was in fact made. And next, you must determine whether you believe the statement[s] to be inconsistent with one another. If you find the statement[s] were made and you find them to be inconsistent, then you may consider any prior inconsistent statement simply and only as a factor in evaluating the believability and reliability of the witness's testimony here at trial.

> Such prior statement may not be consider[ed] by you for the truth of its contents. The statement is only to be consider[ed] as they reflect upon the credibility of the witness' trial testimony.

Id. at 436-437. Upon completion of the court's instructions to the jury, the jury retired to deliberate. Id. at 463-464.

V.    Jury Deliberations, Verdict, and Sentence

During jury deliberations, the jury sent a note to the court asking to have a portion of the testimony read back to them. The note read as follows: "We would like [to] hear read back the questions and answers of each person['s] identification at the lineup[, i.e.] the question[s] and responses that took place behind the one-way mirror . . . from Detective Hutchison's testimony . . . ." Id. at 465. Out of the presence of the jury, the court noted that, because the rules of evidence limited his testimony, Detective Hutchison only testified as to the lineup identification made by Belton. Id. Subsequently, the court had the court reporter read the relevant portions of Detective Hutchison's testimony back to the jury. Id. at 467-468.

On May 15, 2006, the jury completed its deliberations and reached a verdict. May 15, 2006 Minutes, Park Aff., Ex. A, Part 11, 474. The jury found Davis guilty of second-degree murder and second-degree weapon possession. Id. at 475.

On June 6, 2006, the court sentenced Davis to concurrent prison terms of eighteen years to life for the second-degree murder count and ten years for the second-degree weapon possession count. June 6, 2006 Minutes, Park Aff., Ex. A, Part 12, 15.

VI.    Post-Conviction Proceedings

In August 2008, defendant filed a direct appeal in the Second Department from his judgment of conviction. Park Aff. ¶ 7. On appeal, Davis argued, inter alia, that he was denied effective assistance of counsel when his attorney failed to raise certain objections under

N.Y.C.P.L. §§ 60.25 and 60.35 during trial. Park Aff., Ex. B, 49 n.7. On June 2, 2009, the Second Department unanimously affirmed Davis' judgment of conviction. People v. Davis, 63 A.D.3d 755 (2d Dep't 2009). The Second Department held, without explaining its rationale, that Davis "was not denied meaningful representation . . . ." Id. (citations omitted).

By letter dated June 26, 2009, Davis applied to the New York Court of Appeals for leave to appeal the Second Department's decision. Park Aff., Ex. D. On August 11, 2009, the Court of Appeals denied his application. People v. Davis, 13 N.Y.3d 743 (2009) (Smith, J.).

VII.    The Instant Action

In his petition for a writ of habeas corpus, Davis argues that the Second Department's decision – concluding that he was not deprived of effective assistance of trial counsel – is an unreasonable application of Strickland v. Washington, 466 U.S. 688 (1984). Davis claims that, during his criminal trial, his trial counsel unreasonably failed to raise certain objections under N.Y.C.P.L. §§ 60.25 and 60.35. He further contends that his trial counsel unreasonably failed to request the limiting instruction required under § 60.35. Davis asserts that he was prejudiced by trial counsel's errors. Thus, he claims that his trial counsel was ineffective under Strickland and the Second Department unreasonably applied that case in affirming his conviction.

Respondent argues that the Second Department did not unreasonably apply Strickland in this case. It claims that Davis' trial counsel reasonably decided not to object under §§ 60.25 and 60.35. Moreover, even if trial counsel did unreasonably fail to object, respondent asserts that Davis cannot demonstrate that he was prejudiced by trial counsel's errors. Additionally, respondent argues that Davis was not prejudiced by trial counsel's failure to request a limiting instruction under § 60.35. Thus, respondent contends that Davis' counsel was effective under Strickland and the Second Department reasonably applied that case in affirming his conviction.

For the reasons set forth below, the court holds that the Second Department did not unreasonably apply Strickland in this case. The court finds that the Second Department could reasonably have concluded that Davis failed to demonstrate the requisite prejudice arising from trial counsel's errors. Accordingly, Davis' petition for a writ of habeas corpus is denied.

## DISCUSSION

I.  Legal Standard

Because the Second Department adjudicated petitioner's ineffective assistance of counsel claims on the merits, this court must apply the "highly deferential standard for evaluating state-court rulings" under 28 U.S.C. § 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). Under § 2254(d), the petition "shall not be granted with respect to [such a] claim . . . unless the adjudication of the claim:"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'" Guiets v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010) (citation omitted). A district court may grant habeas relief under the "unreasonable application" clause of § 2254(d)(1) "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 413 (2000). The Second Circuit has stated that the

11

"unreasonable application" standard "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) (internal quotation marks and citations omitted). "Although [s]ome increment of incorrectness beyond error is required, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id. (alteration in original; internal quotation marks and citation omitted). Where the state court has issued a summary order denying a petitioner's claim on the merits, the petitioner is entitled to habeas relief under the "unreasonable application" clause only if he can show that "there was no reasonable basis" for the state court's decision. Cullen, 131 S.Ct. at 1402.

The Supreme Court's decision in Strickland is the clearly-established federal law that governs ineffective assistance of counsel claims. Id. at 1403. "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so *undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. (emphasis in original; citation omitted). Strickland articulates a two-prong test for ineffective assistance of counsel claims. First, a petitioner must demonstrate that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." Strickland, 466 U.S. at 688. Under this first prong, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Cullen, 131 S.Ct. at 1403 (internal quotation marks and citation omitted). "To overcome that presumption, a defendant must show that counsel failed to act 'reasonably considering all the circumstances.'" Id. (citation omitted). Under the second prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466

12

U.S. at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Cullen, 131 S.Ct. at 1403 (citation omitted). "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Id. (citation omitted).

In sum, the standard under which a federal habeas court reviews a state court's decision denying a Strickland claim is "doubly deferential." Id. The court takes a "highly deferential" look at counsel's performance under Strickland "through the "deferential lens of § 2254(d)." Id. (internal citation omitted). To prevail in this case, petitioner must demonstrate that it was necessarily unreasonable for the Second Department to conclude: (i) that he had not overcome the strong presumption of his trial counsel's competence and (ii) that he had failed to undermine confidence in the jury's verdict. See id.

II.    Trial Counsel's Failure to Raise Objections under N.Y.C.P.L. §§ 60.25 and 60.35

Petitioner asserts that the Second Department unreasonably applied Strickland with respect to his claim that his trial counsel failed to raise certain objections during trial. Petitioner argues that his trial counsel unreasonably failed to object (i) under N.Y.C.P.L. § 60.35 to the prosecutor's impeachment of Belton with his prior inconsistent statements[1] and (ii) under N.Y.C.P.L. § 60.25 to Detective Hutchison's testimony concerning Belton's lineup

---

[1] N.Y.C.P.L. § 60.35(1) states:

When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.

Except as provided in N.Y.C.P.L. § 60.35(1), a party may not impeach its own witness with prior inconsistent statements. See N.Y.C.P.L. § 60.35(3).

Petitioner argues that Belton's prior inconsistent statements were not admissible under this provision. He claims that Belton's trial testimony – that he could not recall the identity of the shooter – did not "tend to disprove" the prosecutor's position that Davis was the shooter.

13

identification.[2] Petitioner contends that, if his trial counsel had raised those two objections,

Belton's identification of petitioner as the shooter would not have been presented to the jury.

Absent that identification, petitioner claims there is a reasonable probability that the outcome of

his trial would have differed. He therefore argues that his trial counsel was ineffective under

Strickland, and it was unreasonable for the Second Department to hold otherwise.

　　In opposition, respondent argues that the Second Department did not unreasonably apply

Strickland with respect to trial counsel's failure to raise those two objections. It claims that trial

counsel reasonably decided not to object under §§ 60.25 and 60.35. Moreover, even if trial

counsel unreasonably failed to raise those objections, respondent asserts that petitioner cannot

demonstrate prejudice because Belton's identification was cumulative of other testimony.

　　"The performance and prejudice prongs of Strickland may be addressed in either order,

and 'if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

---

[2] N.Y.C.P.L. § 60.25 states:

　　1. In any criminal proceeding in which the defendant's commission of an offense is in issue, testimony as
　　provided in subdivision two may be given by a witness when:

　　　　(a) Such witness testifies that:

　　　　　　(i) He observed the person claimed by the people to be the defendant either at the time and place of the
　　　　commission of the offense or upon some other occasion relevant to the case; and

　　　　　　(ii) On a subsequent occasion he observed, under circumstances consistent with such rights as an accused
　　　　person may derive under the constitution of this state or of the United States, a person whom he recognized
　　　　as the same person whom he had observed on the first or incriminating occasion; and

　　　　　　(iii) He is unable at the proceeding to state, on the basis of present recollection, whether or not the
　　　　defendant is the person in question; and

　　　　(b) It is established that the defendant is in fact the person whom the witness observed and recognized on the
　　　　second occasion. Such fact may be established by testimony of another person or persons to whom the
　　　　witness promptly declared his recognition on such occasion.

　　2. Under circumstances prescribed in subdivision one, such witness may testify at the criminal proceeding that
　　the person whom he observed and recognized on the second occasion is the same person whom he observed on
　　the first or incriminating occasion. Such testimony, together with the evidence that the defendant is in fact the
　　person whom the witness observed and recognized on the second occasion, constitutes evidence in chief.

Petitioner argues that Detective Hutchison's testimony concerning Belton's lineup identification of Davis as the
shooter was not admissible under this provision. He claims that Belton did not testify that he had no "present
recollection" of Davis as the shooter.

14

prejudice . . . that course should be followed.'" Harris v. Artuz, 288 F. Supp. 2d 247, 256

(E.D.N.Y. 2003) (alteration in original) (quoting Strickland, 466 U.S. at 697), aff'd 100 Fed.

Appx. 56 (2d Cir. 2004). Because the court's analysis of the prejudice prong resolves the claim

at issue here, the court addresses only that prong. The court thus assumes that (i) petitioner's

trial counsel unreasonably failed to object under §§ 60.25 and 60.35 and (ii) if trial counsel had

properly raised those objections, Belton's prior inconsistent statements and Detective

Hutchison's testimony about Belton's lineup identification would not have been admitted. The

relevant question therefore is whether the Second Department could reasonably have concluded

that the improper admission of the testimony regarding Belton's identification did not prejudice

petitioner. See Jones v. Woods, No. 07-CV-1326 (CBA), 2009 U.S. Dist. LEXIS 118045, at

*19-*20 (E.D.N.Y. Dec. 18, 2009).

The court holds that the Second Department could reasonably have reached such a

conclusion. Specifically, the court concludes that the Second Department could reasonably have:

(i) found that the testimony regarding Belton's identification was cumulative of the identification

testimony by Machicote and Pou, (ii) fully credited the identification testimony by Machicote

and Pou, and (iii) rejected petitioner's assertions that the prosecutor's summation and the juror's

read back request demonstrated prejudice. Accordingly, because the Second Department could

reasonably have concluded that petitioner failed to demonstrate the requisite prejudice, that court

did not unreasonably apply Strickland with respect to the claim at issue here.

A.   *The Testimony Regarding Belton's Identification was Cumulative of the*
     *Identification Testimony by Machicote and Pou*

"In evaluating the Strickland prejudice prong, a court considers the cumulative weight of

error to determine whether the prejudice reaches the constitutional threshold." Jones, 2009 U.S.

Dist. LEXIS 118045, at *19-*20 (citing Harris, 288 F.Supp.2d at 256). "The court must also

15

keep in mind that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Harris, 288 F.Supp.2d at 256 (quoting Strickland, 466 U.S. at 696). "[T]he thinner the case against the defendant, the greater the impact of counsel's error . . . ." Jones, 2009 U.S. Dist. LEXIS 118045, at *19-*20 (citation omitted). "[T]he stronger the case, independent of the error, the less likely relief." Id. at *20 (citation omitted).

Belton's identification of petitioner as the shooter was cumulative of other testimony at trial. Absent Belton's identification, "[t]his was not a thin case based on circumstantial evidence." See id. Rather, aside from Belton, the government presented the identification testimony of two eyewitnesses to the shooting: Machicote and Pou. Machicote and Pou gave consistent descriptions of the shooter. Machicote testified that the shooter had brown-skin, braids to the back, and facial hair on his upper lip and chin. Pou testified that the shooter was light-skinned with braids and that he could not recall whether the shooter had facial hair.[3] Both eyewitnesses identified petitioner as the shooter during a lineup and subsequently identified him as the shooter again during trial. Belton's prior inconsistent statements – in which he described the shooter and made an in-court identification of petitioner as the shooter – were consistent with and redundant of the testimony by Machicote and Pou. Likewise, Detective Hutchison's testimony concerning Belton's lineup identification was cumulative of that testimony. The testimony regarding Belton's identification therefore was "icing on an otherwise wholly-sufficient prosecution case," and its admission was not prejudicial. Wilson v. Van Buren, No. 07 Civ. 3567 (LAK)(FM), 2010 U.S. Dist. LEXIS 92876, at *25-*26 (S.D.N.Y. July 16, 2010)

---

[3] To the extent petitioner argues that Machicote's description of the shooter as brown-skinned is not consistent with Pou's description of the shooter as light-skinned, the court rejects that argument.

(improper admission of identification testimony not prejudicial where testimony cumulative of two other witnesses); Jones, 2009 U.S. Dist. LEXIS 118045, at *19-*20 (same).

B.    *Petitioner has Failed to Undermine the Identification Testimony by Machicote and Pou*

In an attempt to show that Belton's identification was not cumulative, petitioner claims that Machicote's testimony was not credible and that Pou's testimony was equivocal. Petitioner contends that, because Machicote was Harper's brother-in-law, he was an "interested" witness, who had a motive to see that "someone got punished." Petitioner's Reply Memorandum of Law ("Pet. Reply), Dkt. No. 8, 7. Furthermore, petitioner contends that Machicote's criminal history undermined his credibility. With respect to Pou, petitioner argues that his identification of petitioner as the shooter was uncertain, in that Pou used the term "resemble" when identifying petitioner and he stated that the "main thing" he knew about the shooter was that he had braids. Petitioner argues that, "without braids, [Pou] could not make a definitive identification." Id. at 4. Petitioner contends that, because the identification testimony of Machicote and Pou was questionable, Belton's identification cannot be considered cumulative.

Despite petitioner's contentions, though, there is reason to fully credit the identification testimony of both Machicote and Pou. To begin with, petitioner offers no support for his claim that Machicote falsified his testimony. Machicote had never met petitioner prior to the morning of the shooting, and petitioner has pointed to no convincing reason why Machicote would perjure himself. The court rejects petitioner's unsupported assertion that Machicote lied because he had a desire to see that "someone got punished" for his brother-in-law's death. If anything, his relation to Harper suggests a motive to see that the correct person be punished. Moreover, while Machicote's criminal history may raise questions regarding his credibility, it does not render him incredible per se. On the contrary, in this case, Machicote's identification testimony has indicia

17

of trustworthiness. Machicote testified that he saw the shooter's face in a well-lit area and from a short distance away. He was not intoxicated at the time. He provided a description of the shooter that was consistent with Pou's description, and he identified petitioner as the shooter in a lineup and at trial. Significantly, even though Machicote described the shooter's braids as a key identifying characteristic, he was able to identify the petitioner as the shooter when he had a short, crew-cut hairstyle. All of these factors suggest that Machicote's testimony was credible. Thus, in light of Machicote's credible testimony, Belton's identification was cumulative.[4]

Likewise, there is reason to fully credit the identification testimony of Pou. Pou also testified that he saw the shooter's face in a well-lit area and from a short distance away. He was not intoxicated at the time, and his description of the shooter was consistent with Machicote's description. He identified petitioner as the shooter in a lineup and at trial. In making his identification at trial, Pou did state that petitioner "resemble[d]" the shooter, but Pou's use of that term does not necessarily cast doubt upon his identification. Read in the context of his testimony, Pou's use of that term is fairly understood to connote his belief that petitioner had altered his hairstyle since the shooting. At no point, does Pou suggest that he was uncertain about his identification of petitioner as the shooter. Rather, he indicates that the shooter's braids were the "main thing" he recalled about him, but that he was able to identify petitioner as the shooter despite the fact that petitioner did not have braids at the time of the lineup or at trial. Thus, contrary to petitioner's contention, Pou's ability to make a definitive identification did not turn on petitioner's hairstyle; indeed, Pou was able to make a definitive identification despite a

---

[4] Petitioner also argues that Machicote's identification testimony was not credible because his testimony differed in certain respects from Pou's testimony about the altercation at the club. "Specifically, Machicote testified that the incident began with an altercation between Blake Harper and some other men, while Harold Pou testified that Machicote was the actual instigator, and that Harper simply walked over to help him." Petitioner's Memorandum of Law ("Pet. Mem."), Dkt. No. 2, 44-45. This inconsistency does not undermine the credibility of Machicote's identification testimony. As discussed above, Machicote's identification testimony is consistent with that of Pou, and Machicote had no reason to fabricate that testimony.

significant change in petitioner's appearance. In any event, even if Pou's identification was somewhat equivocal, that identification and his description of the shooter corroborate Machicote's testimony, and Pou's testimony may be credited to that extent. Thus, under any reading of Pou's testimony, Belton's identification was cumulative.[5]

C. *Petitioner has Otherwise Failed to Demonstrate Prejudice*

Petitioner also argues that the improper admission of testimony concerning Belton's identification was prejudicial because the prosecutor emphasized that identification in her summation. In her summation, however, the prosecutor focused on the identifications made by all three eyewitnesses. She attached no particular importance to Belton's identification. Given the cumulative nature of his identification, her summation was not prejudicial.

To argue prejudice, petitioner also relies on the jury's request during deliberations to have the court read back Detective Hutchison's testimony about the three lineup identifications. Because the trial court permitted Detective Hutchison to testify only as to Belton's identification, petitioner infers that the jury must have been particularly focused on that identification. That argument is highly speculative. An equally, if not more, plausible explanation for the jury's request is that they were confused as to why Detective Hutchison testified only about Belton's identification, and they wanted to ensure that they had not missed his testimony regarding the other two identifications. This explanation accounts for the jury's request to hear Detective Hutchison's testimony about all three lineup identifications. In any event, however, it is

---

[5] Petitioner's reliance on Wray v. Johnson, 202 F.3d 515 (2d Cir. 2000), in misplaced. In that case, the court found that the improper admission of a witness' identification testimony was prejudicial, despite the fact that the government had presented the identification testimony of two other eyewitnesses. That case is distinguishable from the instant case. The court in Wray found the identification testimony of the two other eyewitnesses to be highly questionable. Id. at 530 ("[T]he only admissible evidence that Wray was the gunman came from officers who, by reason of shadows, distance, altitude, and lack of binoculars, were poorly situated to see his face, and who relied principally on the fact that Wray was dressed similarly to the gunman . . . [By contrast,] the victims of the hold-up testified that Wray was not the gunman."). Here, by contrast, for the reasons discussed above, there is reason to fully credit the identification testimony of Machicote and Pou.

impossible to ascertain the focus of the jury's deliberations and the true motivation behind their request. The court declines to find prejudice based upon a speculative interpretation of the jury's ambiguous read back request.

In sum, the Second Department could reasonably have concluded that petitioner did not demonstrate prejudice arising from trial counsel's failure to object under N.Y.C.P.L. §§ 60.25 and 60.35. Thus, considering the "highly deferential" standard of review, this court holds that the Second Department did not unreasonably apply Strickland with respect to that claim.

III.    Trial Counsel's Failure to Request a Limiting Instruction under N.Y.C.P.L. § 60.35

Petitioner claims that the Second Department unreasonably applied Strickland with respect to his claim that his trial counsel failed to request a limiting instruction under N.Y.C.P.L. § 60.35. Section 60.35(2) requires the court to instruct the jury that prior inconsistent statements may be "received only for the purpose of impeaching the credibility of a witness," not as evidence-in-chief, "[u]pon receiving such evidence at a jury trial." Petitioner argues that trial counsel unreasonably failed to request such a limiting instruction when Belton's prior inconsistent statements were admitted at trial. Because the court failed to give such an instruction at that time, petitioner asserts that the jury may have considered those prior inconsistent statements as evidence-in-chief. He contends that, if trial counsel had requested the appropriate limiting instruction, the jury would have considered those statements only for purposes of impeachment, and there is a reasonable probability that the outcome of his trial would have differed. Thus, he claims his trial counsel was ineffective under Strickland, and it was unreasonable for the Second Department to hold otherwise.

The court disagrees. Even if the jury considered Belton's prior inconsistent statements as evidence-in-chief, as discussed above, those statements were cumulative of the identification

testimony by Machicote and Pou. Petitioner therefore was not prejudiced by the court's failure

to give the limiting instruction. Moreover, the trial court gave an appropriate limiting instruction

during its final jury instructions. That limiting instruction cured any prejudice that petitioner

may have suffered due to the court's failure to give a limiting instruction upon admission of the

prior inconsistent statements. See Jones, 2009 U.S. Dist. LEXIS 118045, at *18-*19 ("Although

counsel should have reminded the court to give a limiting instruction, Jones once again fails to

show prejudice since an appropriate instruction was given in the final charge."). Because

petitioner has failed to demonstrate the requisite prejudice, the court holds that the Second

Department did not unreasonably apply Strickland with respect to his claim that his trial counsel

failed to request a limiting instruction under N.Y.C.P.L. § 60.35.

## CONCLUSION

For the foregoing reasons, the court holds that the Second Department did not unreasonably apply <u>Strickland</u> in this case. The court finds that the Second Department could reasonably have concluded that Davis failed to demonstrate the requisite prejudice arising from trial counsel's errors. Accordingly, Davis' petition for a writ of habeas corpus is denied.

Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. In addition, this court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. <u>Coppedge v. United States</u>, 369 U.S. 438, 444-445 (1962). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/s/(ARR)

_____
Allyne R. Ross
United States District Judge

Dated:     June 27, 2011
           Brooklyn, New York